# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KATHLEEN A COY,**

      **Plaintiff,**

      v.

**COUNTY OF DELAWARE, et al.,**

      **Defendants.**

**Case No. 2:12-CV-00381**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

Plaintiff, Kathleen A. Coy, brings this employment-discrimination action against Defendants County of Delaware, Ohio ("Delaware County") and Robert Greenlaw ("Greenlaw"). She alleges sexual harassment and age discrimination in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), Ohio Revised Code § 4112.99, and Ohio common law. This matter is before the Court for consideration of two motions—Defendants move for summary judgment, and Plaintiff objects to two of the exhibits Defendants offer in support of their motion. For the reasons that follow, Plaintiff's objection, doc. 26, is **OVERRULED as moot**, and Defendants' motion for summary judgment, doc. 22, is **GRANTED in part and DENIED in part**.

## I. BACKGROUND

### A. Factual Background

In 1991, Delaware County hired Plaintiff to work as a dispatcher in its 9-1-1 Communications Call Center ("the Call Center"). Doc. 29 ¶ 13. In April of 1993, she was promoted to the position of Watch Commander, in which she supervised the Call Center's

dispatchers; in 1998, she was promoted to the position of Communications Systems Technician, which allowed her to further her supervisory and administrative responsibilities within the Call Center. *Id.* In June of 2009, Delaware County hired Greenlaw to head the Call Center as its Executive Director. According to her affidavit, Greenlaw referred to Plaintiff as "a QA Manager," and her job responsibilities at that time included being "in charge of the tour bus, testing the 9-1-1 system, and continu[ing] to train employees." *Id.* She also avers that she "[q]ued all medical, fire and police calls that came into the 9-1-1 Center." *Id.*

Plaintiff no longer works at the Call Center. She now brings suit based on her time working for Greenlaw. She bases her claims on Greenlaw's treatment of the Call Center's female employees, Defendants' refusal to promote her, and the phasing out of her role at the Call Center.

### 1. Greenlaw's Treatment of the Female Employees at the Call Center

In her deposition, Plaintiff recounted several examples of Greenlaw's comments and conduct. She testified, for example, about Greenlaw's behavior in front of a group of potential new hires present at the Call Center for an aptitude test. According to Plaintiff, Greenlaw would sit by himself and observe the applicants while they were taking tests, *see* doc. 35 at 35–36; he would also walk around during the test, observe the physical appearances of the applicants, and then comment on those appearances to other Call Center employees, *see id.* at 31–32. Plaintiff remembers a specific incident where Greenlaw observed a young woman lean forward while taking the test. Greenlaw noted that she had a tattoo on her lower back, and then said "I hope that one passes" to some of the current Call Center employees present for the testing. *Id.* at 33.

2

Plaintiff further avers that Greenlaw made lewd "comments concerning the female hires by commenting on their cleavage." Doc. 43 at 83 (Ex. F ¶ 8).

Plaintiff also provides examples of Greenlaw commenting on the looks of several of her co-workers, specifically Brittany Craig, Karla Jacobs, Jeanette Adair, and Elissa Sessley. In her deposition, for example, Plaintiff testified that Greenlaw often commented on Adair's and Sessley's breast sizes. *See* doc. 35 at 50–53. Plaintiff recounts that he frequently referred to them as having "big boobs," *id.* at 52; and that Greenlaw would further comment—about either Adair or Sessley—by saying, "I bet her back hurts carrying all that around," *id.* at 51. Plaintiff also spoke in her deposition about an instance when Greenlaw was getting ready to head into a meeting with Craig and Jacobs. As she explains it, Craig and Jacobs sat waiting in Craig's office for the meeting; and, as Plaintiff walked by, Greenlaw—about to walk into the meeting—looked at her and said, "Man, look at this. I'm getting ready to go into a meeting with these two girls and I forgot my date rape medicine." Doc. 35 at 41. Plaintiff says that she "found this comment to be sexually offensive and demeaning because" Jacobs and Craig were younger than she, "and very attractive." Doc. 43 at 82 (Ex. F ¶ 7). She also testified that Greenlaw's comments led Call Center employees to avoid contact with him. *See* doc. 35 at 59.

Plaintiff also presents affidavits and deposition testimony of additional Call Center female employees. One is Elissa Sessley, who worked as a dispatcher, supervisor, and training coordinator during her time with the Call Center. *See* doc. 28 ¶ 3. She asserts in an affidavit that Greenlaw "engaged in both sexually and racially offensive behavior" toward her from 2009 until "he resigned his employment in September 2012." *Id.* As to the sexual behavior, Sessley states that Greenlaw "made comments about the anatomy of female applicants" in the presence of

3

Sessley and her co-workers, *id.* ¶ 4; made "these sexually offensive comments daily around [the] office," *id.*; and, during a three-week stretch of trainings in the summer of 2010, that "Greenlaw strategically placed himself near female applicants and commented to [Sessley's] assistants about the applicant[s'] body parts," *id.*

Plaintiff additionally submits the deposition of Gina Fosone, a recruiter who worked in human resources ("HR") for Delaware County. Doc. 36 at 6–7. She confirmed that Greenlaw made at least one comment—"possibly" more—about the looks, dress, or anatomy of new-hire candidates, *id.* at 18; that he made a "grunt" toward her on one occasion, *id.* at 21; and that Greenlaw referred to himself as "boob," instead of "Bob," on one occasion, *see id.* at 33–39. Plaintiff also offers the deposition of Brenda Hopkins, who worked as an administrative assistant and fiscal manager at the Call Center. Doc. 40 at 7. Hopkins described one instance where she and Greenlaw were working in close proximity to one another in his office; according to Hopkins, "Greenlaw made a comment that it got extremely hot in there at that time." *Id.* at 10–11. In terms of physical location, "[h]e was sitting in his chair and I was leaning over him looking at paperwork," *id.*

Plaintiff's co-worker Brittany Craig also testified regarding the comments that Greenlaw directed her way. One relates to comments Greenlaw made about Craig and her husband—he "ask[ed] if I was taking care of my husband . . . I assumed he was insinuating if I was having sex with my husband." Doc. 33 at 44; *see id.* at 47 (Craig testifying that Greenlaw made this comment to her "on a regular basis"). Another again relates to Craig and her husband—"I had my hair pulled back to the side with a barrette and he stated he thought my hair was flat from my husband banging my head on the headboard." *Id.* at 45. Another concerned "a comment about

4

what [Craig] had worn to a public relations event"—Greenlaw said "that he thought he was going to have to go into the restroom after seeing what [Craig] wore." *Id.* at 46. On a different occasion, Craig recounts that "[t]here was a comment about a large cup that [Greenlaw] had on his desk similar to a plastic hospital cup, and [a co-worker] had commented that it looked like a giant urine specimen cup, and Bob [Greenlaw] stated no, that was for the semen collection." *Id.* at 46. Craig also testified that Greenlaw had "pet names" for her, names like "[s]weetie" and "sweet pea." *Id.* at 46–47.

### 2. HR's Involvement

During Plaintiff's employment, Delaware County utilized an employee handbook with a sexual-harassment policy. Dawn Huston, Delaware County's HR director during the time relevant to this case, *see* doc. 38 at 8–10,[1] confirmed that the handbook had a specific sexual-harassment policy during the time in question. It defined sexual harassment as "any unwelcome or unsolicited sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." Doc. 43 at 39 (Ex. E at 14). The policy states that this kind of conduct is illegal and will not be tolerated. *See id.* As for reporting, it sets forth the following procedure:

> The employee shall **immediately** report the harassment to his/her supervisor; however, the employee is expected to bypass the standard chain-of-command and should report to the next highest supervisor, appointing authority, or Personnel Coordinator when reporting allegations of sexual harassment when the person to whom the employee would normally report is the person who allegedly committed the harassment. . . .

*Id.* at 40 (Ex. E at 15). The policy directs employees to complete "a Harassment Complaint form" in the event of reporting. *Id.* It further notes that "every allegation will be taken seriously,

---

[1] The record indicates that Huston worked as the HR director for Delaware County from 2008 until 2010. Doc. 38 at 7–8. In January of 2011, Huston became the director of administrative services. *Id.* at 8. The record indicates, without stating directly, that Delaware County used the terms "administrative services" and "human resources" interchangeably. *See, e.g.*, *id.* at 10.

investigated thoroughly and completely, and an appropriate course of action will be taken to resolve the situation in the most expeditious means possible by law, if warranted." *Id.* According to Huston, the HR department's policy was to accept and investigate verbal complaints of sexual harassment during the time in question. Doc. 38 at 20. The department kept a record of all of its complaints, including those lodged verbally. *See id.*

A number of County employees—including Plaintiff—testified to lodging some sort of complaint with HR based on Greenlaw's comments and conduct. Craig said she talked to Huston "multiple times." Doc. 33 at 48. She further testified that Huston asked what Craig wanted done about the comments. *Id.* at 49. Craig responded that she wanted nothing done; she further indicated that Huston "did not indicate . . . that she was going to do an investigation." *Id.* Huston testified in her deposition that Craig "came to [Huston's] office and . . . described the comments that [Greenlaw] had made." Doc. 38 at 27. Huston said that Craig "found [the comments] inappropriate for the work setting," and that Huston agreed with her. *Id.* at 28. Huston said she did not make any notes of their conversations, and that she followed up Craig's complaints by "sitting in a meeting" and "acting as a mediator" between Craig and Greenlaw. *Id.* at 28–29. Huston further confirmed that she did not conduct an investigation as a result of Craig's complaints or of the meeting she mediated. *Id.* at 29–30. In March of 2011, Craig also complained to Greenlaw's supervisor, County Administrator Tim Hansley. *See* doc. 33 at 54. Hansley testified that Craig complained to him about Greenlaw's conduct and comments as early as November of 2010. *See* doc. 39 at 25. He specifically testified regarding the nature of the comment Craig reported: that it "was something do with her hair was flat on the back because she and her husband had had rough sex against the headboard, and that he was—it was intended

6

as a joke which she took it—she was offended by it." *Id.* at 25–26. Hansley did not follow up formally with Craig's complaint, nor did he report the matter to HR. *See id.* at 25–29.

Sessley stated in her affidavit that she raised some of her issues with HR. She specifically says that on

> April 21, 2011, I attended a meeting with Dawn Huston, the Director of Administrative Services, with the County of Delaware. During the meeting, I verbally complained that Mr. Greenlaw had created a hostile work environment for me to work in, and that I cannot work with him. Ms. Huston listened to my complaint but did not offer to conduct an investigation. I did not see her taking any notes during our conversation. She did not offer me a harassment complaint form.

Doc. 28 ¶ 9. For her part, Plaintiff also testified that she brought Greenlaw's conduct and comments to the attention of HR representatives. She points to a comment she made to HR employees Gina Fosone and Lisa Ianotta: "How does this man get away with what he does and what he says?" Doc. 35 at 39. They responded, according to Plaintiff, by saying "I don't know. I don't know." *Id.*

### 3. The Promotion and the Reduction in Force

In February of 2010, Delaware County posted an opening for internal applications for the Call Center position of Operations Manager. Doc. 43 at 15 (Ex. C). Several Call Center employees testified that the Operations Manager operated as the de facto second-in-command position within the center. *See, e.g.*, doc. 33 at 15. Among others, the job-opening description listed the following requirements for prospective applicants: "Bachelor's degree and a minimum of five (5) [years of] work experience in a public safety communications position plus two (2) years demonstrated management experience[;] OR high school diploma or GED and a minimum

of ten (10) years related work experience including two (2) years demonstrated management experience." Doc. 43 at 15 (Ex. C).

Plaintiff and Craig were among several employees to apply for the position, *see* doc. 33 at 18; doc. 35 at 64, and both made it to the final round of interviews, *see* doc. 35 at 65. On her resume for the position opening, Craig indicated that she had a B.A. in Equine Facility Management from Otterbein College. Doc. 43 at 14 (Ex. B). She further listed the following employment experience: (1) Limited Credit Services—New Accounts Associate from 1993–1994, and Customer Services Representative from 1994–1996; (2) All Seasons Carriage Service, Inc.—Manger from 1996–1997, and President from 1997–2003; (3) Countryside Veterinary Clinic—Veterinary Assistant from 2001–2006, and Office Manager from 2001–2006; and (4) the Delaware County Sheriff's Office—Communications Dispatcher from 2003–2009, and Communications Supervisor from 2009 to the date of her application for the Operations Manager position in February of 2010. *See id.* at 13–14. In her affidavit, Plaintiff says the following about her own resume, application, and specifically her work experience:

> When I applied for the Operations Manager position, I had over twenty years of experience as a supervisor and working in administrative positions at the Delaware County 9-1-1 Center. I began my employment as a Dispatcher in October 1991. In April 1993, I was promoted the position of Watch Commander and supervised Dispatchers at the Center. In 1998, I was promoted to the position of Communications System Technician. In this position, I performed both supervisory and administrative responsibilities such as training employees on new equipment and new software. In 2009, [Defendant] Robert Greenlaw . . . referred to me as a QA Manager. I was put in charge of the tour bus, testing the 9-1-1 system, and continued to train employees on mobile suitcases for the 9-1-1 Back Up System. I Qued all medical, fire and police calls that came into the 9-1-1 Center.

Doc. 29 ¶ 13. Plaintiff also states that she had earned the following certifications at the time she applied for the Operations Manager position: Emergency Medical Dispatch, Emergency Fire

Dispatch, Emergency Police Dispatch, Emergency Medical Dispatch Quality Assurance, Emergency Fire Dispatch "EFD-Q," CPR, and Law Enforcement Agencies Data System. *Id.* ¶ 14. She further states that she "was also trained AQUA, ProQA, [and] Alerts software (user and administrative)." *Id.* At the time Craig applied for the position, she averred that she was certified in Law Enforcement Agencies Data System and Computerized Criminal History. *See* doc. 33 at 19.

Delaware County employed a two-stage interview process for both Plaintiff and Craig. Stage one entailed an interview with five members of the Call Center hiring board, one of whom included Greenlaw. Doc. 33 at 68. The hiring board asked the candidates pre-formulated questions and then scored each answer on a rubric from 1–5. *See id.* at 68–71. As an exhibit to their motion, Defendants submit the interview score sheets of Plaintiff and Craig. *See* doc. 22-2. Plaintiff contests the validity of the score sheets and objects to the Court considering them in resolving the motions *sub judice*. *See* doc. 26. As for the second stage of the interview process, Plaintiff and Craig underwent an evaluation by an outside psychologist. Defendants submit only Plaintiff's evaluation as an exhibit, *see* doc. 22-3, the validity of which Plaintiff also contests, *see* doc. 26. At the time Craig applied for the job, she was thirty-five years old, *see* doc. 43 at 7; at the time Plaintiff applied, she was fifty-nine years old, *see id.* at 81 (Ex. F). The Call Center hired Brittany Craig for the position of Operations Manager on March 1, 2010. Doc. 33 at 27.

Plaintiff also brings claims relating to the loss of her job in the Call Center. In October of 2010, Deborah Martin, at that time the acting County Administrator, asked Greenlaw to send her his goals for 2011. Doc. 43 at 181 (Ex. W); *see* doc. 37 at 78–79. Shortly after sending along his goals e-mail, Delaware County's voters rejected a .62 mill levy, the proceeds of which would

9

have gone to the Call Center. *See* doc. 35 at 68. According to Craig, Delaware County was "counting on that levy in order to continue to fund services through the 911 center." *Id.* After the levy failed, Craig and Greenlaw began e-mail communications in March of 2011 about the possible elimination of several Call Center positions—positions occupied by Plaintiff, Sharon Creamer, and Elissa Sessley. *See* doc. 43 at 86 (Ex. G). Craig voiced concern in her e-mail to Greenlaw; the elimination of Plaintiff meant that no one in the Call Center would be certified to handle emergency medical department and emergency police department calls. *Id.*; *see* doc. 37 at 88–90. Greenlaw responded, saying that he "would be happy to get rid of them"—referring to Plaintiff, Creamer, and Sessley—"tomorrow." *See* doc. 43 at 86 (Ex. G).

While Craig and Greenlaw contemplated terminating Plaintiff's position, Plaintiff was involved in an incident in late January or early February of 2011. *See, e.g.*, doc. 35 at 90–98. She was walking in an open area at the Call Center and said, "Oh, my gosh, please, somebody give me a gun and shoot me." *Id.* at 94. Co-worker Brenda Hopkins overheard the statement and reported it to HR. *See id.* Plaintiff blames her comment on her mounting frustration "with the lack of any management attention to stop the usage of sexually offensive language." Doc. 30 ¶ 8. Based on her comment, members of management and members of the HR department, including Dawn Huston, *see* doc. 35 at 98–102, scheduled a disciplinary hearing for Plaintiff, *see id.*; doc. 30 ¶ 8. According to Plaintiff's licensed professional clinical counselor, notice of the disciplinary hearing led Plaintiff to "an emotional breakdown." Doc. 30 ¶ 8. She then went on family medical leave in February of 2011. *Id.* ¶ 10.

With Plaintiff out on leave, the issue of Call Center funding came back to the voters in May of 2011. At that point, the voters of Delaware County approved a .45 mill tax levy, with the

proceeds slated to go to the Call Center. *See* doc. 37 at 85–87. Greenlaw pressed forward with the plan to eliminate the three positions at the Call Center. In his deposition, he offered the following rationale for his beliefs:

> Q   And then when the levy passed in May of 2011, were there sufficient funds to allow you to address the concerns you had about the staff in the 9-1-1 Center?
>
> A   There were sufficient funds to address my concerns with having enough telecommunicators on duty but not to support the support staff we had, the administrative staff we had.
>
> Q   Now, besides the issue of lack of funds that you discussed in your Statement of Rationale, was there any other reason why you recommended the abolishment of these three positions?
>
> A   I didn't feel we were getting our money's worth out of the positions.

*Id.* at 86–87.

Greenlaw and Craig drafted a statement of rationale regarding the dismissal of the three positions, and submitted it to the Board of County Commissioners in late July of 2011. *See* doc. 37 at 80–81; *id.* at 92; doc. 43 at 172–80 (Ex. V). The statement in part related the dismissals to lack of funds and the need to maintain the current staffing level of telecommunicators: "Telecommunicators are necessary to sustain the mission of the Department and, therefore, if the salaries for the [three positions] can be used for maintaining operations, it will assist with the impending lack of funds and allow the Department to maintain the current staffing of telecommunicators." Doc. 43 at 172 (Ex. V). The statement also offered the following explanation specific to the elimination of Plaintiff's position:

> [T]he Emergency Communications Department has experienced a significant improvement in technology. The new Patriot phone system provides automated information which was previously manually performed. The County IT Department provides in-house programs to increase efficiency while cutting costs for Emergency Communications. . . .

. . . .

> Conclusion: Of the tasks or functions [Plaintiff performed in her job] 80% will
> be assumed by other positions and/or have been assumed by County IT. The
> remaining 20% of the tasks and functions will be assumed by other positions
> in the Department or are no longer needed.

Doc. 43 at 179–80 (Ex. V). In his deposition, Greenlaw offered additional reasons for the

elimination of the positions: "we had programs, we were trying to do accreditation, we were

trying to do accreditation regarding dispatch. All things had to be scaled back because we didn't

get the funding to do it. Some of the goals I outlined . . . couldn't be done with that lesser levy."

Doc. 37 at 93. He further explained the goals—one related to accreditation in "EMD, EFD and

EDP, [and] CALEA," one was to "[p]urchase and equip [a] new field communications unit," and

one was to "revamp the training facility." *Id.* at 93–94.

Based on the statement of rationale, Tim Hansley, the County Administrator, sent

Plaintiff a letter on July 25, 2011. Doc. 43 at 210 (Ex. BB). Hansley informed Plaintiff that Ohio

Revised Code provided laid-off employees the right to displace less senior employees, but that

the County did not believe there were positions for Plaintiff to displace. *Id.* Dawn Huston was

aware of the letter Hansley sent to Plaintiff. Doc. 38 at 77. She confirms that Delaware County

did not offer Plaintiff a position outside the Call Center; that she was aware that Plaintiff's

doctors recommended against Plaintiff working in the Call Center given Plaintiff's medical

concerns; and that she did not look for a position for Plaintiff outside the Call Center before

Hansley sent the letter on July 25 of 2011. *Id.* In her affidavit, Elissa Sessley states that the

County hired three new dispatchers on August 22, 2011. Doc. 28 ¶ 19. She noted that "[f]rom

[her] observations, they each appeared to be in their 20's." *Id.* According to Sessley, Plaintiff was "about 30 years older" than the newly hired dispatchers.

### 4. The Investigation

In April of 2011, Plaintiff's counsel sent a letter to the Delaware County Commissioners indicating her intent to prosecute the claims now at issue. Doc. 43 at 129 (Ex. P). He also sent a letter to Dawn Huston, at this time the Director of Administrative Services for the County, making a public-records request for documents relevant to the instant action. *See id.* at 132 (Ex. Q). The parties then met in June of 2011 for a meeting to discuss, among other issues, Plaintiff's claims. Doc. 39 at 57. Plaintiff was asked to fill out the County's Sexual Harassment Complaint form; she complied and sent the form to the County. *See* doc. 43 at 141–42 (Ex. S).[2]

Upon receiving the complaint, Delaware County decided to investigate Greenlaw's conduct, Craig's promotion, and the elimination of Plaintiff's position. They hired an outside investigator—Felicia Bernardini—to do so in July of 2011. Doc. 32 at 12. Sometime thereafter, but before late September of 2011, she issued her report. Bernardini concluded the following regarding Greenlaw's conduct as it pertained to his allegedly sexually charged comments:

> Although Mr. Greenlaw strongly denies it, there are multiple witnesses who report that he makes sexual comments, creating a work environment that could be considered hostile. Some of the incidents mentioned by the complainants were corroborated; others were not. Only one interviewee had not heard Mr. Greenlaw make sexual innuendos or sexual comments in the workplace. One interviewee acknowledged that Mr. Greenlaw had made sexually charged comments but did not personally find them offensive. All of the other interviewees reported being targets of, or witnesses to, Mr. Greenlaw's sexual comments.

Doc. 43 at 105–06 (Ex. J). Her report found little to no evidence of age-related comments made by Greenlaw. *See id.* at 106. Greenlaw resigned from his position with the Call Center on

---

[2] Plaintiff's co-workers Sharon Creamer and Elissa Sessley also submitted formal complaint forms at that time. *See* doc. 43 at 145–63 (Ex. T).

September 26, 2011. *See* doc. 37 at 101. He testified that he was not asked to resign, *id.*, but did so instead because of misgivings about the direction of the Call Center, *see id.* at 99.

**B. Procedural Background**

Based on the above, Plaintiff filed this action in May of 2012. She brings a claim for the creation of a hostile work environment in violation of Title VII and Ohio Revised Code § 4112.02(A); a claim of age discrimination in violation of the ADEA, 29 U.S.C. § 623(a), and Ohio Revised Code § 4112.14; and a claim of common-law sexual harassment pursuant to *Kerans v. Porter Paint Co.*, 61 Ohio St. 3d 486, 575 N.E.2d 428 (Ohio 1991). Defendants moved for judgment on the pleadings in July of 2012. Doc. 6. During the briefing for that motion, Plaintiff did not oppose dismissal of her federal claims against Greenlaw. *See Coy v. Cnty. of Delaware*, No. 2:12-CV-00381, 2013 WL 1282028, at \*2 n.2 (S.D. Ohio Mar. 26, 2013). The Court granted Defendants' motion in part, but only to the extent Planitiff's age-discrimination claims relied on Ohio Revised Code § 4112.02(N); the Court allowed her age-discrimination claims predicated on Ohio Revised Code § 4112.14 to proceed. *See Coy*, 2013 WL 1282028, at \*5. Defendants now move for summary judgment on the remainder of Plaintiff's claims.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. DISCUSSION

The Court finds it necessary to describe the precise claims remaining in this case. Pursuant to previous Orders, the following claims remain: (A) sexually hostile work environment—(1) a claim against Delaware County that Greenlaw's conduct created a sexually hostile work environment in violation of Title VII; (2) a claim against both Delaware County and Greenlaw that the conduct violates Ohio Revised Code § 4112.02(A); (B) a claim against Delaware County and Greenlaw that Greenlaw's conduct constitutes sexual harassment under

15

Ohio common law, *see Kerans v. Porter Paint Co.*, 61 Ohio St. 3d 486, 575 N.E.2d 428 (Ohio 1991); and, finally, (C) age discrimination—(1) a claim against Delaware County that Greenlaw's and the Call Center's actions in passing over Plaintiff for a promotion, and in electing not to renew Plaintiff's position, each constitute age discrimination in violation of the ADEA; (2) a claim against both Delaware County and Greenlaw that this conduct violates Ohio Revised Code § 4112.14. The Court considers each in turn.

## A. Sexually Hostile Work Environment

Plaintiff claims that Greenlaw's comments and conduct created a sexually hostile work environment. After the motion to dismiss, her sexual-harassment claims remain against Delaware County under Title VII,[3] and against both Delaware County and Greenlaw under Ohio Revised Code § 4112.02(A). The analysis for a sexual-harassment claim under Ohio Revised Code Chapter 4112 mirrors that of the same claim under Title VII. *See, e.g., Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) ([T]he district court correctly recognized that sexual harassment claims under Ohio Revised Code § 4112 are generally governed by the same standards as sexual harassment claims under Title VII . . . .").

---

[3] Claims under Title VII are subject to a statute-of-limitations defense. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 499 (6th Cir. 2001) ("Title VII states that a discrimination charge must be filed within three hundred days after the alleged unlawful employment practice occurred [.]' 42 U.S .C. § 2000e-5(e)(1)."). Defendants' briefing does not make clear whether they contend against Plaintiff proceeding with her federal sexual-harassment claims based on this defense. More, neither party directly addresses this issue, which requires both a fact-specific analysis and the application of law open to interpretation. See *id.* at 499 ("The proper focus when determining the starting point of the limitations period "is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." (internal quotation marks omitted)); *id.* at 500 ("[A] plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful."). Neither party also addresses the issue of whether the continuing-violation doctrine would guard the federal claims against the statute-of-limitations defense. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000) ("The continuing violation doctrine provides that when there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." (internal quotation marks omitted)). For these reasons, the Court does not address the statute-of-limitations issue.

"Accordingly," the Court analyzes Plaintiff's "hostile work environment claims collectively under federal law standards." *Id.* (citations omitted).

In order for Plaintiff to establish a prima facie case of hostile work environment based on sexual harassment, she must show five elements by a preponderance of the evidence:

> (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability.

*Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). Defendants do not contest the first two elements of the claim, and the record confirms that Plaintiff meets them—(1) she is a woman; and (2) Greenlaw's alleged conduct was sexual in nature, *see Rothenbusch v. Ford Motor Co.*, 61 F.3d 904, 1995 WL 431012, at *3 (6th Cir. 1995) ("The employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. . ."). They disagree as to the final three.

**1. Harassment Based on Sex**

Defendants argue that Plaintiff fails to plead gender-based animus for Greenlaw's comments and conduct. Based on the record testimony, a reasonable jury could find that Greenlaw directed his conduct and comments at women, and that his conducts were sexual in nature. Plaintiff testified—and multiple co-workers corroborated—that Greenlaw commented on female applicants' appearances, including, in one instance, when an applicant had a lower-back tattoo; commented on female applicants' anatomy, including their cleavage and breast sizes; and commented on the breast sizes of women who worked at the Call Center. This does not comport with the sort of "otherwise neutral conduct" this Circuit has described as consistent with a lack of

17

gender bias. *Bryant v. Martinez*, 46 F. App'x 293, 296 (6th Cir. 2002). The Sixth Circuit has also already spoken to this issue in clear terms: "the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis in original). With this as the law, the record is clear in this case. Greenlaw only directed his comments and conduct toward women, meaning that the treatment would not have occurred but for Plaintiff's gender.

### 2. Unreasonable Interference with Work Performance Because of a Hostile, Offensive, or Intimidating Work Environment

As to the fourth element, Defendants move for summary judgment on the argument that Greenlaw's comments are not offensive enough to render the work environment hostile or offensive. This fourth element has both an objective and subjective aspect. *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). The subjective: "the victim must subjectively regard [the] environment as abusive." *Id.* Plaintiff testified to this several times in her deposition, *see, e.g.*, doc. 35 at 38–39, and in her affidavit, *see* doc. 29 ¶ 15. The objective: "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Black*, 104 F.3d at 826. Whether this is so, and whether Plaintiff thus meets the fourth element, depends on a "totality-of-the-circumstances test." *Williams*, 187 F.3d at 563. Relevant information includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

18

### a. Applicable Conduct

The Court must first determine the conduct it can consider for the sake of the totality-of-the-circumstances test. Defendants argue that Plaintiff impermissibly relies on the accounts of her co-workers to help paint the picture of the kind of environment Greenlaw's conduct and comments created. Defendants point to the Sixth Circuit case of *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874 (6th Cir. 2013), for the proposition that this Court should not consider "me too" evidence from Plaintiff's co-workers. The panel in *Warf* explained that courts dealing with the fourth element's objective test "may also consider general sexual harassment in the workplace." *Id.* at 878 (citing *Quanex Corp.*, 191 F.3d at 661). It further noted that "evidence of other sexual harassment claims may help support a hostile work environment claim, but evidence of harassment to others does not weigh as heavily as evidence directed against the plaintiff." *Id.*

Applied here, *Warf* allows the Court to consider the depositions of Plaintiff's co-workers. To be sure, the panel in *Warf* did hold that the district court properly declined to consider the depositions of other women who had complained about sexual harassment in the office. *Id.* But it did so because (a) the plaintiff "base[d] the majority of her hostile work environment claim" on the fact that other women in her office brought sexual harassment claims, *id.*, and (b) the other harassment claims came against alleged harassers with whom the plaintiff did not work, *see id.* at 879. The facts of this case differ from those of *Warf*. Here, Plaintiff does not base the majority of her claims against Greenlaw and the Call Center based on other employees' complaints. The facts provided at the outset, and discussed in more detail below, demonstrate Plaintiff's presence for a number of Greenlaw's comments. The additional accounts of her co-workers thus supplement her claim, rather than provide almost the entire basis of it. Further, unlike *Warf*,

Plaintiff indeed worked with the alleged harasser—the same person whom her co-workers verified as making inappropriate sexual comments.

This does not mean the Court can consider every part of each deposition from Plaintiff's co-workers. Whether or not to consider the related testimony "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). In other words, one of the key issues is whether Plaintiff was aware of the other alleged harassment, or at least had heard about the other alleged harassment. *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 263 (6th Cir. 2001) ("[T]he District Court failed to consider the instances of sexual harassment involving other women of which plaintiff was aware during her employment. While [the plaintiff] admittedly did not know the details of these episodes, she was aware of many rumors.").

Based on these guideposts, some of her co-workers' testimony helps her and some does not apply to this case. Plaintiff testified to being aware of Greenlaw's comments about the size of Elissa Sessley's breasts, which mirrors Sessley's affidavit testimony. She testified that Gina Fosone, a member of the HR team, told Plaintiff that members of HR called Greenlaw "boob" instead of his first name, "Bob." Doc. 35 at 52. The testimony of Craig, Sessley, Fosone, and Plaintiff all corroborate each other—and thus are relevant to the fourth element's objective test— regarding how often Greenlaw directed sexually related comments toward women in the Call Center, or about women in general. *See* doc. 28 ¶ 4 (Sessley noting that Greenlaw made "sexually offensive comments daily around our office"); doc. 29 ¶ 5 (Plaintiff's affidavit noting that Greenlaw regularly made comments of a sexual nature); doc. 33 at 47 (Craig testifying that

Greenlaw made comments of a sexual nature to her on a regular basis); doc. 36 at 21 (Fosone testifying that Greenlaw made a comment regarding potential new hires, and that he "possibly" did so more than once). Finally, Sessley, Craig, and Plaintiff also all testified that Greenlaw positioned himself during new-hire training so as to observe the anatomy of female applicants, and that he commented on their appearance multiple times while doing so.

In short, the Court will consider the above evidence. It is "closely related to the plaintiff's circumstances and theory of the case," *Mendelsohn*, 552 U.S. at 388; and Plaintiff was aware of or at least heard about the other comments or alleged harassment, *see Wanchik*, 6 F. App'x at 263.

### b. Totality of the Circumstances

The dispositive fourth-element issue remains: whether, based on a totality of the circumstances, the comments and conduct at issue rise to the level of being severe, persistent, or pervasive enough to constitute a sexually hostile environment under the Sixth Circuit's case law. Plaintiff argues yes, Defendants argue no. The resolution of their disagreement depends in large part on a number of factors—factors best captured by examining two similar Sixth Circuit hostile-environment cases: *Black*, 104 F.3d at 827 (holding that the comments at issue did not create an objectively hostile work environment), and *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (allowing the hostile-environment issue to proceed to trial). The comments at issue here bear similarities to those cases, and thus both cases merit a closer look.

The court in *Black* considered the following comments:

"Nothing I like more in the morning than sticky buns" stated directly to the plaintiff; statements at multiple meetings that a land development adjacent to a Hooters Restaurant should be named "Hootersville," "Titsville," or "Twin Peaks;" a statement by her immediate supervisor that the plaintiff was "paid great money for a woman" after the plaintiff asked about her bonus; laughter at

> the plaintiff after she mentioned her negotiations to purchase land from a Dr.
> Busam, apparently pronounced "bosom" followed by more "jokes" about the
> "Hootersville" land; a statement by the President of the defendant company
> after the plaintiff inquired about the location of a piece of property that it was
> near a biker bar and "[s]ay, weren't you there Saturday night dancing on the
> tables?"; and a statement in the context of a discussion about getting a county
> official to sign a document to "[j]ust get the broad to sign it."

*Abeita*, 159 F.3d at 251–52 (recounting the relevant comments from *Black*). Again, these

comments are in some ways similar to those at issue in this case: both often had to do with sex

and both often related to female anatomy. In analyzing these related comments, the court in

*Black* held in favor of the defendant on a hostile-environment claim. It focused in large part on

the fact that many of the comments at issue were not necessarily directed at the Plaintiff. *See*

*Black*, 104 F.3d at 826 (noting that, while "sex-based comments need not be directed at a

plaintiff in order to constitute conduct violating Title VII," the fact that they were not supports

the proposition "that the conduct . . . was not severe enough to create an objectively hostile

environment"). The same could be said of the comments in this case: like in *Black*, many of

Greenlaw's comments were not necessarily directed at Plaintiff. In this sense, *Black* supports

Defendants' point of view that the conduct at issue fails to rise to the level necessary for a

hostile-environment claim.

On the other hand, the facts of this case do have some appreciable differences from those

in *Black*. The only comment directed toward Plaintiff—Greenlaw's date-rape comment

regarding her colleagues—could be construed as equally, if not more, hostile than "the 'sticky

buns' or 'dancing on the tables' statements in *Black*." *Abeita*, 159 F.3d at 252. Further, even

though not directly stated about Plaintiff, the nature of the comment, one about rape, could

objectively be construed as severe. *See Quanex Corp.*, 191 F.3d at 658. This comment also

differs from those in the cases Defendants cite for the proposition that an inappropriate comment here and there cannot rise to the level necessary to create a hostile environment. None of those comments pertained to rape. *See, e.g., Mann v. Navicor Group, LLC*, 488 F. App'x 994, 999– 1000 (6th Cir. 2012) (boss suggested that plaintiff "ditch" her husband and go with him to Greece); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 459 (6th Cir. 2000) (none of supervisor's comments had to do with gender or had an anti-gender animus).

Several additional factors tip in Plaintiff's favor. First, Plaintiff offers other examples beyond the date-rape comment. Plaintiff and several of her co-workers testified to Greenlaw's comments and conduct when it came to the new-hire training. According to this testimony, Greenlaw commented that, based on their appearance, he hoped people passed the new-hire test; and made lewd comments on the new-hire testees' cleavage. Elissa Sessley, one of Plaintiff's co-workers, corroborates Plaintiff's testimony on this front, and adds that Greenlaw did this for the bulk of a three-week training session she ran in the summer of 2010, and that he also did this "every time [Sessley and Greenlaw] interviewed together until" Greenlaw banned Sessley from participating in the process in 2011. Doc. 28 ¶ 4. Plaintiff also testified to overhearing and witnessing comments Greenlaw made about the anatomy of the female workers at the Call Center.

Second, the frequency of the above conduct distinguishes the facts of this case from those cited by Defendants for support. To be sure, these comments are no stronger than those made in cases where the Sixth Circuit has held against the plaintiff on the objective prong of element four. *See, e.g., Abeita*, 159 F.3d at 251–52 (recounting the nature of the comments in *Black*). The difference, though, lies in the record in this case. Counter to Defendants' argument, these were

not "sporadic sexual jokes." Doc. 22 at 8; *see also Vernon v. AlliedBarton Sec. Services, LLC*, No. 3:10-00167, 2013 WL 2643808, at *9–10 (M.D. Tenn. June 12, 2013) (six incidents over a two-month period insufficiently pervasive to create a sexually hostile environment); *Stacy v. Shoney's, Inc.*, 142 F.3d 436, 1998 WL 165139, at *1–2 (6th Cir. 1998) (three comments over a two-month span insufficiently pervasive). Rather, Planitiff testified that Greenlaw regularly made sexually related comments, *see* doc. 29 ¶ 5; Sessley testified that he made "sexually offensive comments daily" around the office, doc. 28 ¶ 4; and Craig testified that he did so on a regular basis, doc. 33 at 47.

In short, based on the present record, the Court cannot say as a matter of law that the evidence does not demonstrate an objectively hostile work environment. Plaintiff and a number of co-workers have testified that Greenlaw's comments were "were commonplace, ongoing, and continual." *Abeita*, 159 F.3d at 252. Given that, according to *Abeita*, the frequency of the comments is an important element in the hostile-environment analysis, this separates the present case from those where courts found against the hostile-environment claim. *See id.*[4] ("However, plaintiff's assertion that comments like these were commonplace, ongoing, and continual establishes that the statements were more pervasive or widespread than the ones made in *Black*."). Based on their pervasiveness, a reasonable jury could conclude that Greenlaw's conduct and comments created a sexually hostile work environment. Plaintiff has thus met the first four elements of her prima facie case.

### 3. Basis for Employer Liability

---

[4] Also of note, the Court further finds that additional factors tick in Plaintiff's favor on this element. The physical appearance of the employees in this case had nothing to do with the nature of Plaintiff's or Greenlaw's employment. *Abeita*,159 F.3d at 252. Further, the comments in this case were not always, or primarily, "the banter of group" as in *Black. Id.* Finally, the primary Defendant—here, Greenlaw—was Plaintiff's boss, and Plaintiff worked with him on a daily basis, both of which are similar to *Abeita. Id.*

Defendants also contest the final element of Plaintiff's prima facie case—whether there is a basis for employer liability. The guiding law as to this element depends on a number of factors. The first has to do with whether Greenlaw qualifies as a "non-supervisory co-worker[]" or a "supervisor with immediate or successively higher authority over" Plaintiff. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009). The record demonstrates—and the parties do not contest—that Greenlaw served as Plaintiff's supervisor during the time in question in this case. *See, e.g.*, doc. 33 at 15. As for the second factor, Plaintiff does not argue that the harassment at issue culminated in a tangible employment action. Doc. 27 at 26; *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). This means Delaware County will be liable for the hostile work environment Greenlaw created unless it successfully establishes the following affirmative defense by a preponderance of the evidence: "(a) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Gallagher*, 567 F.3d at 275 (quoting *Ellerth*, 524 U.S. at 765) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)) (the "*Ellerth/Faragher* defense"). Defendants assert this affirmative defense, which Plaintiff contests on both prongs.

Defendants devote much of their briefing on this point to arguing the second prong, that Plaintiff did not formally complain about Greenlaw's conduct. Even so, a genuine issue of material fact exists as to this prong, meaning Defendants have failed to meet their burden as to the *Ellerth/Faragher* defense. Defendants point to Plaintiff's admission that she never submitted a formal complaint, or even an informal complaint, to her supervisor. Doc. 35 at 40. But the face

of the policy, if it indeed governs Call Center employees, allows her not to do so if the alleged harasser is a supervisor. *See* doc. 43 at 40 (Ex. E). Instead, the policy allowed her to report to "the next higher supervisor, appointing authority, or Personnel Coordinator." *Id.* Dawn Huston also testified that HR accepted sexual harassment complaints verbally, doc. 38 at 10, which the law compels, *see Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005). To this end, the record demonstrates that Plaintiff asked Lisa Iannotta and Gina Fosone, both HR employees, how Greenlaw "get[s] away with what and what he say[s]." Doc. 35 at 39. Although Defendants contend this was not a valid complaint, an issue of fact remains as to whether this statement comported with the policy as a valid verbal complaint.

Even assuming Defendants' second-prong argument correct, several issues of material fact remain as to the first prong, each of which also prevents Defendants from successfully asserting the *Ellerth/Faragher* affirmative defense.

The first prong of the defense has two subparts. One has to do with prevention— "employers have an *affirmative duty* to prevent sexual harassment by supervisors." *Clark*, 400 F.3d at 349 (internal quotation marks omitted). And one has to do with correction—"an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it." *Id.* "Generally, an employer satisfies the first part of this two-part standard when it has promulgated *and* enforced a sexual harassment policy." *Gallagher*, 567 F.3d at 275 (emphasis added). The facts of this case require a closer look at each sub-part.

As to prevention, the dissemination of a facially effective sexual-harassment policy tends to meet the employer's burden. *See Clark*, 400 F.3d at 349–50. Plaintiff argues that the record presents a question of fact as to whether the Call Center's purported policy actually, in fact,

applied to the Call Center. Defendants argue that it did. They point to the policy itself, which came in the Delaware County employee handbook, *see* doc. 43 at 39–40 (Ex. E); they also point out that Plaintiff testified to being generally aware of the policy, *see* doc. 35 at 39–40; and that Greenlaw, Craig, and Huston all identified the policy as the County's sexual-harassment policy, *see* doc. 37 at 11–12 (Greenlaw); doc. 33 at 40 (Craig); doc. 38 at 13 (Huston). It is thus clear, on one hand, that the Call Center's employees operated under the assumption that the purported handbook governed their actions. But Hansley, the County Administrator for at least part of the time in question, *see* doc. 39 at 6, testified that he did not know whether the handbook actually covered employees and supervisors of the Call Center, *see id.* at 44–45. More important to Defendants' *Ellerth/Farager* defense, he testified that the handbook and its sexual harassment policy "only covers those agencies that have adopted this as their guidelines." *Id.* at 44. He went on: "And as to the 9-1-1 Governing Board, it's unclear as to whether this handbook covered them or not, especially in the case of the appointed director." *Id.* at 44–45. This answer led to the following exchange in his deposition:

Q. In your view, were employees who worked in the 9-1-1 center covered under Exhibit 5 [verbatim], the employee—this employee handbook?

A. I think my testimony is that it's unclear as to whether or not they were covered under this handbook.

Q. And if it's unclear, was there any other written policy addressing sexual or workplace harassment that applied to employees of the 9-1-1 center?

A. I don't have knowledge to answer that question. I don't know.

*Id.* at 45–46. Based on this exchange, a genuine issue of material fact exists as to whether the County's sexual-harassment policy technically applied to the Call Center employees. If it did not, Plaintiff ultimately had no recourse for any complaints she did or might have raised.

27

Defendants have thus failed to prove the *Ellerth/Faragher* defense by a preponderance of the evidence.[5]

Even if the County met the first part of its prong-one burden, Plaintiff argues that Defendants failed to meet their affirmative obligation to *correct* sexual harassment by supervisors. *See Clark*, 400 F.3d at 349. Defendants disagree and insist that Plaintiff failed to register a complaint that properly complied with the policy. Even if not properly reported as a technical matter, "once an employer has knowledge of the harassment, the law imposes upon the employer at duty to take reasonable steps to eliminate" the purported harassment. *Clark*, 400 F.3d at 349. The record demonstrates with clarity that members of the HR team were aware of Greenlaw's comments and conduct. HR employees Iannota and Fosone witnessed Greenlaw speak about the anatomy of potential new hires, doc. 28 ¶ 4; Sessley testifies that she complained to Huston regarding Greenlaw's conduct, *id.* ¶ 8; Craig testified that she reported Greenlaw's conduct to Huston several times, doc. 33 at 48; and Plaintiff testified to asking Iannotta and Fosone how Greenlaw "get[s] away with what and what he say[s]," doc. 35 at 39. These are some of the instances Plaintiff provides to demonstrate that Defendants knew of Greenlaw's comments. These instances give rise to a genuine issue of material fact as to whether and when Defendants were on notice of Greenlaw's comments and conduct; and, if so, whether this knowledge triggered their responsibility to correct it.[6]

---

[5] Merely having a sexual-harassment policy does not insulate an employer on prong one of the *Ellerth/Faragher* defense. The policy must also, on its face, meet a minimum level of effectiveness. *See Clark*, 400 F.3d at 350 (laying out the four requirements of a minimally effective sexual-harassment policy). The parties have not briefed the issue of whether the purported controlling sexual-harassment policy meets the minimum bar for effectiveness on its face. The Court thus declines to speak to this issue.

[6] To this end, an issue of fact remains as to whether—assuming the above facts triggered Defendants' responsibility to correct Greenlaw's conduct—Defendants met their "duty to take reasonable steps to eliminate" Greenlaw's conduct. *Clark*, 400 F.3d at 349. This depends in part on whether, as a general matter, Defendants acted reasonably in dealing with Greenlaw, *see id.* at 400 F.3d at 349 ("[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it."); and also on

In short, Defendants cannot benefit from the *Ellerth/Faragher* affirmative defense. Genuine issued of material fact exist as to both prongs. Because Plaintiff has met her prima facie case, and because Defendants' affirmative defense fails, Defendants' motion for summary judgment is denied.[7]

### B. Sexual Harassment—Ohio Common Law based on *Kerans*

Plaintiff also brings an Ohio common-law claim for sexual harassment under *Kerans v. Porter Paint Co.*, 61 Ohio St. 3d 486, 575 N.E.2d 428 (Ohio 1991). According to *Kerans*, Ohio common law allows for an employer to be held liable for the sexual harassment of an employee. *See* 61 Ohio St. 3d at 491–94, 575 N.E.2d at 432–34. As the Court explained in its motion-to-dismiss Order, it adopts the majority approach of interpreting *Kerans* to employ the basic elements of sexual harassment claims under Title VII and Ohio Revised Code Chapter 4112. *Coy v. Cnty. of Delaware*, No. 2:12-CV-00381, 2013 WL 1282028, at *8 (S.D. Ohio Mar. 26, 2013); *see, e.g., Gallagher*, 567 F.3d at 278 (recognizing that the elements of an Ohio common law sexual harassment claim generally track "those of a Title VII hostile work environment claim"); *Southerland v. Sycamore Cmty. Dist. Bd. of Educ.*, 277 F. Supp. 2d 807, 818 (S.D. Ohio 2003) (acknowledging that courts "have applied the elements of an Ohio Revised Code Chapter 4112 sexual harassment claim in interpreting *Kerans*"); *Kilgore v. Ethicon Endo–Surgery, Inc.*, 172 Ohio App. 3d 387, 397, 875 N.E.2d 113, 120 (Ohio Ct. App. 2007) ("Ohio courts interpreting and applying *Kerans* have adopted the elements of an [Ohio Revised Code] Chapter 4112 sexual-

---

whether, to the extent Plaintiff followed the policy's reporting requirement, Defendants in fact followed their own policy in investigating and attempting to correct the problems, *see id.* ("While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.").

[7] Both sides raise additional arguments as to the *Ellerth/Faragher* defense. Because the genuine issues of material fact articulated above compel denial of summary judgment, the Court does not address these additional arguments.

harassment claim . . . ."). *But see, e.g., Griswold v. Fresenius USA, Inc.*, 964 F. Supp. 1166, 1173 (N.D. Ohio 1997) (limiting application of *Kerans* to its facts).

The parties attempt to re-argue several aspects of Plaintiff's hostile-environment prima facie case to which the Court has already spoken. As explained above, Plaintiff met her prima facie burden with respect to her claims under Title VII and Ohio Revised Code. Further, and more to this point, genuine issues of material fact remain as to when Defendant Delaware County knew or should have known of the harassment; and whether, given when they did know, the County failed to take immediate and appropriate corrective action. The Court also points out that, "in the main, the elements of [a *Kerans*] claim are identical to those of a Title VII hostile work environment claim." *Gallagher*, 567 F.3d at 278. Based on this, the Court declines to re-hash the parties' arguments as to the main-line elements of Plaintiff's sexual-harassment claim.

The parties do contest two aspects of Plaintiff's prima facie *Kerans* claim that require further discussion. First, Defendants argue that Plaintiff has generally failed to allege facts that rise to the level of sexual assault. This argument does not help Defendants. Again, as explained above and in the previous Order, the Court adopts the majority approach with respect to a *Kerans* claim, meaning that *Kerans* applies beyond instances of possible sexual assault.

Second, the parties disagree about an additional requirement—beyond the requirements for a Title VII claim or one under the Ohio Revised Code—necessary to demonstrate a prima facie claim under *Kerans*: that the harassing employee "has a past history of sexually harassing behavior about which the employer knew or should have known." *Kilgore*, 172 Ohio App. 3d at 397, 875 N.E.2d at 120 (internal quotation marks omitted). Defendants argue that Plaintiff has not presented evidence that Greenlaw had a past history of this sort of behavior about which they

knew or should have known. Plaintiff argues otherwise. As the Sixth Circuit has recognized, "courts interpreting *Kerans* have not determined a precise definition of 'past history.'" *McCombs v. Meijer, Inc.*, 395 F.3d 346, 354 (6th Cir. 2005); *cf. Seiber v. Wilder*, No. 94 CA 32, 1994 WL 558969, at *3 (Ohio Ct. App. Oct. 12, 1994) (indicating that an employer is not entitled to summary judgment under *Kerans* simply because the actor in questions "had not been previously accused of sexual harassment"). Instead, courts dealing with *Kerans* claims have resorted to fact-specific inquiries to compare the case before them to the one in *Kerans*. *See, e.g., Hart v. Justarr Corp.*, 649 N.E.2d 316, 318, 98 Ohio App. 3d 673, 676 (Ohio Ct. App. 1994). In taking this path, the Court finds that a genuine issue of material fact remains as to: (1) whether Greenlaw had a past history of sexually harassing behavior; and (2) whether Defendants knew or should have known about this behavior. Comparing the record in *Kerans* to the record in this case underscores this conclusion.

In *Kerans*, the employer was told about the alleged harasser on several occasions before the plaintiff began working at the company. For example, "one of the women who preceded Kerans" testified "that she informed company management on four different occasions" of sexually charged run-ins with the accused harasser. *Kerans*, 61 Ohio St. 3d at 493, 575 N.E.2d at 434. She also "stated that on two separate occasions she requested a transfer from company management but that in both cases her request was denied." *Id.* Further "[a]nother company employee . . . provided testimony regarding an incident which occurred" prior to the alleged harassment, and testified that "the incident was reported to company management." *Id.* The *Kerans* Court held that "an abundance of evidence indicat[ed] that" the defendant company "knew or should have known" about the harasser's past history of sexually charged conduct. *Id.*

31

The record in this case is similar to the one in *Kerans* with respect to whether Delaware County knew or should have known of Greenlaw's past history of alleged harassment. As a general matter, the record indicates that several employees complained about Greenlaw's sexually inappropriate remarks and conduct during Greenlaw's tenure in charge of the Call Center. Elissa Sessley stated in her affidavit that she complained to "Dawn Huston, Director of Administrative Services" on more than one occasion regarding Greenlaw's behavior, doc. 28 ¶ 17; the record, however, is unclear on when exactly Sessley complained and thus when exactly the County might have been aware of the issues based on her complaints.

The record also demonstrates that several members of Delaware County's HR team were aware of the alleged conduct. For example, as the Court has already discussed, HR employee Gina Fosone testified to witnessing several sexually charged comments from Greenlaw. *See* doc. 36 at 18–21; *id.* at 33–39. Brittany Craig said she talked to Huston "multiple times" regarding Greenlaw's conduct and comments. Doc. 33 at 48. She did not testify to exactly when she talked to Huston about the comments, but did state that the comments took place "over a five- to six-month period" from October of 2010 to March of 2011. *Id.* at 50. Huston confirmed the meetings with Craig, *see, e.g.*, doc. 38 at 28; testified to "acting as a mediator" between Craig and Greenlaw, *id.* at 28–29; and confirmed that she did not conduct an investigation as a result of Craig's complaints or of the meeting she mediated, *id.* at 29–30. The record does not make clear when these conversations took place or when Huston first became aware of Greenlaw's conduct.

Finally, in March of 2011, Craig also complained to Greenlaw's supervisor, County Administrator Tim Hansley. *See* doc. 33 at 54. Hansley testified that Craig complained to him about Greenlaw's conduct and comments as early as November of 2010. *See* doc. 39 at 25. He

also specifically testified regarding the nature of the comment Craig reported: that it "was something do with her hair was flat on the back because she and her husband had had rough sex against the headboard, and that he was—it was intended as a joke which she took it—she was offended by it." *Id.* at 25–26. Hansley did not follow up formally with Craig's complaint, nor did he report the matter to HR. *See id.* at 25–29.

In short, the record indicates that at least three of Plaintiff's colleagues witnessed or were subject to Greenlaw's comments and conduct. The record also indicates that multiple employees complained to HR regarding Greenlaw's conduct. Although the timing of when HR knew about Greenlaw's conduct is unclear, the record also demonstrates that multiple employees described Greenlaw's conduct as consistent since the time he began his employment in 2009. The record contains testimony that Brittany Craig experienced his comments as early as October of 2010. At least one member of HR witnessed his conduct during his tenure with the Call Center. Multiple employees reported his conduct to HR. A reasonable jury could conclude that Delaware County knew or should have known about Greenlaw's past history of sexually inappropriate comments and conduct at some point during Plaintiff's employment, and before Plaintiff made her first formal complaint in July of 2011. For these reasons, Defendants' motion for summary judgment on Plaintiff's *Kerans* claim is denied.

## C. Age Discrimination

The following age-discrimination claims remain: (1) an ADEA claim against Delaware County; (2) a claim under Ohio Revised Code § 4112.14 against Delaware County; and (3) a claim under Ohio Revised Code § 4112.14 against Greenlaw. Plaintiff argues that two separate events each independently support her age-discrimination claims: (1) the promotion—when co-

worker Brittany Craig received the job of Call Center Operations Manager instead of Plaintiff; and (2) the layoff—when Delaware County eliminated Plaintiff's position due to, in its view, a reduction in force in the summer of 2011.

### 1. Failure-to-Promote Claim under the ADEA—Delaware County

In moving for summary judgment as to Plaintiff's failure-to-promote claim under the ADEA, Defendants argue that Plaintiff failed to submit a timely charge to the Equal Opportunity Employment Commission ("EEOC"). According to 29 U.S.C. § 626(d)(1)(B), a plaintiff seeking redress under the ADEA must file a charge alleging unlawful discrimination with the EEOC within 300 days of the alleged unlawful practice. *See, e.g.*, *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001) (noting that this 300-day statute of limitations applies in deferral states, such as Ohio). The promotion-related incident occurred in March of 2010. Doc. 33 at 27 (Brittany Craig noting in her deposition that she "was hired March 1st of 2010"). Plaintiff filed her related EEOC charge on August 4 of 2011. Doc. 22-6 at 2. Plaintiff's ADEA claim against Delaware County as it pertains to the promotion is more than a year old and is thus untimely. Accordingly, Defendants' motion for summary judgment as to this claim is granted.

### 2. Failure-to-Promote Claim under Ohio Revised Code § 4112.14—Delaware County and Greenlaw

Plaintiff's failure-to-promote age discrimination claim against both Delaware County and Greenlaw under Ohio Revised Code § 4112.14 remains. *See Coy*, 2013 WL 1282028 at *5 ("[T]he Court concludes that a six-year limitations period is applicable to age discrimination claims based on violations of § 4112.14."). Ohio courts generally analyze a claim under Revised Code § 4112.14 in the same manner as a claim under the ADEA. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998); *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.

34

3d 175, 177–78, 803 N.E.2d 781, 785 (2004). The ADEA makes it unlawful for an employer to fail or refuse to hire any individual "because of such individual's age." 29 U.S.C. § 623(a)(1); *see also Koval v. Dow Jones & Co.*, 86 F. App'x 61, 65 (6th Cir. 2004) ("Ohio courts recognize that § 4112 . . . provides that a manager may be jointly and/or severally liable with the employer for discriminatory actions taken by the manager against another of the employer's employees.").

A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Whether a plaintiff proffers direct or indirect evidence, the burden of persuasion remains on ADEA plaintiffs to show "that age was the 'but-for' cause of their employer's adverse action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 178 n.4 (2009). Defendants argue—and Plaintiff does not contest—that the failure-to-promote claim relies on circumstantial evidence. The burden-shifting framework of *McDonnell Douglas* thus applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973); *see Ercegovich*, 154 F.3d 344 (6th Cir. 1998).

Under the burden-shifting paradigm, the plaintiff must set forth a prima facie case of discrimination. To do so for a failure-to-promote claim, she must demonstrate that: (1) she was a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) another employee of similar qualifications who was not a member of the protected class received the promotion. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 (6th Cir. 2000). The fourth prong requires replacement by a "substantially" or "significantly" younger person. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to

35

articulate a legitimate, nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to produce sufficient evidence from which the jury may reasonably reject the employer's explanation as pretextual. The plaintiff then bears the burden of pointing to evidence showing that the stated reason was "false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Plaintiff meets her prima facie burden. Defendants do not contest as much. With respect to the first element, the record demonstrates that Plaintiff was over forty years of age—and thus a member of a protected group—when Defendants made the hiring decision. Plaintiff also successfully demonstrates the remaining elements: she applied for and was qualified for the promotion; she interviewed for the position; and Defendants selected Brittany Craig, who was thirty-five years old at the time, for the position instead.

In response, Delaware County produces a legitimate, nondiscriminatory reason for the hiring decision: that it hired Craig instead because she was more qualified for the job. With the burden shifted, Plaintiff can demonstrate pretext in one of three ways: (1) showing that the proffered reason has no basis in fact; (2) showing that the reason did not actually motivate the decision at issue; (3) or showing that the reason was insufficient to justify the decision. *See Braithwaite v. Dep't of Homeland Sec.*, 473 F. App'x 405, 410 (6th Cir. 2012).

Plaintiff here chooses the first path, and argues that the proffered basis for the failure-to-promote decision is "factually false." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds, Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009))). She does so in several ways. First, she moves to strike—or objects[8]—to

---

[8] Although titled a motion to strike, the Court interprets Plaintiff's motion as one objecting to the consideration of the documents at issue. *See* Fed. R. Civ. P. 56(c)(2) (according to the new rules, a party opposing a exhibits for motion for summary judgment can file an objection if it believes that supporting materials "cannot be

two exhibits Defendants attach to their motion for summary judgment. One is the set of interview score sheets that Craig's and Plaintiff's interviewers filled out to evaluate each candidate on her interview-day performance; the other is the psychological evaluation Plaintiff underwent as part of the Operations Manager interview process. According to Plaintiff, Defendants did not properly authenticate any of the documents; and even if they did, the documents should be ruled inadmissible as improper hearsay evidence. Second, Plaintiff argues that Craig, the younger woman hired in Plaintiff's stead, did not meet the minimum objective criteria for the Operations Manager role. Defendants respond only to the first argument by reiterating that the Call Center hired the more qualified candidate in Craig, and by pointing to the two sets of documents Plaintiff moves to strike.

Defendants support their nondiscriminatory reason by arguing that Craig received a "*better* psychological evaluation than Plaintiff." Doc. 49 at 8 (emphasis added). They then point to an exhibit attached to their motion for summary judgment—Plaintiff's psychological evaluation. Doc. 22-3. According to the record, Defendants have not attached Craig's psychological report as an exhibit. Using the word "better" denotes a comparative frame of reference; that is, in order for Defendants to verify Craig in fact received a "better" psychological evaluation, they would have to attach two evaluations—hers and Plaintiff's. The Court must view the submitted evidence and arguments in a light most favorable to Plaintiff at this stage.

---

presented in a form that would be admissible in evidence"); Fed. R. Civ. P. 56 (2010 Advisory Committee comments) (noting that, when a party objects in this manner, it "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated"); *see also Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-CV-1144, 2011 WL 5169384, at *1–2 (W.D. Mich. Oct. 31, 2011) (explaining the effect of the 2010 amendments to the Federal Rules of Civil Procedure, which marked a "sea change in summary judgment procedure"). Further, the Court declines to rule directly on Plaintiff's objection. Even assuming that the documents can be considered, Plaintiff still succeeds in demonstrating genuine issues of material fact with regard to her failure-to-promote claim. Therefore, the objection is overruled as moot at this point. Plaintiff may raise her objection at a later point if she wishes to do so.

Based on this requirement; based on the absence of Craig's evaluation; and regardless of the content of Plaintiff's psychological evaluation, the Court cannot verify that Craig received a *better* psychological evaluation than Plaintiff as part of the Operations Manager interview process. This exhibit thus does not help Defendants for the purpose of resolving the arguments for summary judgment.

The issue remains as to whether Defendants' explanation for hiring Craig is factually false. Defendants argue no, and they point to the fact that Craig received a higher interview score than Plaintiff. The record bears this out. Plaintiff received scores of 39, 40, 46, 39, and 40.5, for an average score of 40.9. *See* doc. 22-2 at 1–10. Craig received scores of 50, 41, 47, 43, and 51, for an average score of 46.4. *See id.* at 11–20. Even so, Plaintiff counters that their interview scores do not matter. She argues that Craig did not meet the Call Center's objective qualifications to be considered for the job; and because Plaintiff did meet the qualifications, she argues, the Call Center could not have hired the better candidate. If true, this would mean Defendants hired someone not qualified—according to their own criteria—for the job, over someone who was qualified. This would, if true, render Defendants' reason for hiring Craig instead of Plaintiff factually false. Whether or not this is true thus calls for a closer look at the record.

The job-opening description listed a number of objective requirements, or "qualifications" for the Operations Manager position. They include, in relevant part: "Bachelor's degree and a minimum of five (5) [years of] work experience in a public safety communications position plus two (2) years demonstrated management experience[;] OR high school diploma or GED and a minimum of ten (10) years related work experience including two (2) years

demonstrated management experience." Doc. 43 at 15 (Ex. C). Plaintiff met these criteria. She graduated from high school. Doc. 35 at 143. According to her affidavit, she had worked in the public-safety-communications field for more than ten years, which included at least two years of management experience. *See* doc. 29 ¶ 13 (Plaintiff's affidavit, noting that she "had over twenty years of experience as a supervisor and working in administrative positions at the Delaware County 9-1-1 Center," and then listing her positions and management-related experience). Brittany Craig met most of these criteria. Her resume indicates that she has a college degree. *See* doc. 43 at 14 (Ex. B). Her resume also indicates that she had worked, by March of 2010, more than the minimum five years in a public-safety-communications position, including from 2003 to 2009 as a communications dispatcher, and from 2009 until her application as a communications supervisor.

Whether or not she met the management-experience requirement is less clear. The objective qualifications require two years of management experience. Plaintiff assumes that the management-experience requirement must have applied to the public-safety field. Defendants do not address the issue. At the time she applied, Brittany Craig did not have two years of management experience in a public-safety-communications position, having served fewer than two years in her communications-supervisor position by that point. If the years-of-management requirement applies solely to the public-safety field, she does not meet the listed, objective qualifications Delaware County posted for the Operations Manager position. If the requirement applies more broadly, Craig appears to satisfy the standard. Her resume lists at least seven more years of positions where she supervised and managed staff. *See id.* at 13 ("Owner and manager of a horse-drawn carriage service operating seven carriages, supervising twelve to fifteen staff

members . . . ."). Because Defendants did not respond to Plaintiff's argument on this point, the Court is unable to determine whether the years-of-management requirement applied to the public-safety field. This question remains, as does the issue of whether Craig in turn met the objective requirements for the Operations Manager role, and thus whether Defendants' proffered nondiscriminatory reason is factually false.

Defendants contend that Plaintiff still fails to meet her burden of showing that "age was the 'but-for' cause of their employer's adverse action." *Gross*, 557 U.S. 178 n.4. The Court disagrees. The evidence "is such that a reasonable jury could return a verdict" concluding that Defendants' proffered reason was pretext in this case. *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248). The Court reaches this conclusion for two reasons.

First, as Plaintiff properly points out, this case closely mirrors the facts of *Carberry v. Monarch Marking Sys., Inc.*, 30 F. App'x 389, 393 (6th Cir. 2002). There, the plaintiff sued his company for hiring a younger person for a job the plaintiff sought. *See id.* at 391–92. The company contended that the younger candidate was better suited for the job, even though he did not meet the published job qualifications. *See id.* at 392. At trial, the plaintiff "proved only that he met the qualifications listed in the job announcement and that [the younger candidate] did not." *Id.* at 393. On appeal, according to the Sixth Circuit, "the district court correctly held that the jury was entitled to *disbelieve* [the defendant company's] explanation in light of the evidence [that the plaintiff] outrivaled [the younger candidate] on the objective criteria." *Id.* The reasoning in *Carberry* applies with equal force to the facts of this case. Like *Carberry*, "[t]he evidence relied upon by Plaintiff is not [her] own subjective belief that [s]he was better qualified . . . but

Defendant[s'] own printed list of qualifications." *Id.* And like *Carberry*, the source of the qualifications matters. That is, if "plaintiff had merely given [her] own subjective opinion that [s]he was better qualified," she might not have raised a genuine issue of material fact. *Id.* Instead, she "contradict[ed] the employer out of its own mouth"—she showed what the Call Center listed as "the objective qualifications, showed that [s]he met them, and showed," arguably, that Brittany Craig did not. *Id.* at 393–94.

Second, Plaintiff also successfully utilizes the Sixth Circuit's opinion in *Bender v. Hecht's Dep't Stores*, 455 F.3d 612 (6th Cir. 2006). There the Sixth Circuit held that a plaintiff bringing a discrimination claim "in the case in which there is little or no other probative evidence of discrimination" has a higher bar with respect to demonstrating pretext. *Id.* at 627. When, as in this case, "qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Id.* The words of *Bender* apply to this case. Plaintiff demonstrates that she had nearly three times as much experience in the field of public-safety communications at the time of the application process. She held far more management experience in the field as well. And she held more safety-related certificates than Craig—certificates that Greenlaw himself validated as necessary for running the Call Center.

In short, Plaintiff has demonstrated that, on the current record, Craig was not necessarily more qualified than Plaintiff for the Operations Manager position. While some other explanation may exist as to why Craig received the job and not Plaintiff, Defendants have not offered one. A reasonable jury could find that Defendants' explanation constitutes pretext given the disparity in experience between Craig and Plaintiff. For these reasons, Plaintiff has demonstrated a

"sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### 3. Reduction-in-Force Claim under the ADEA—Delaware County; and under Ohio Revised Code § 4112.14—Delaware County and Greenlaw

Plaintiff bases her final age-discrimination claim on the elimination of her position at the Call Center. The parties agree that Plaintiff's contention amounts to a reduction-in-force claim, where the plaintiff's position was eliminated altogether instead of the plaintiff merely being fired (and the position subsequently being refilled). *See, e.g.*, *Ercegovich*, 154 F.3d at 349–51. The same burden-shifting approach outlined above applies to this claim. *Id.* at 350. For her prima facie claim, Plaintiff must prove four elements: (1) that she was forty-years old or older at the time of her dismissal; (2) that she was qualified for the position; (3) that she was discharged; and (4) "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* The record demonstrates— and the parties agree—the Plaintiff meets the first three prongs of her prima facie case. The parties disagree on whether Plaintiff meets the fourth prong of her prima facie case.

Plaintiff attempts to satisfy the fourth element by demonstrating "that a comparable non-protected person was treated better." *Ercegovich*, 154 F.3d at 350. For support, she points to Elissa Sessley's affidavit; Sessley averred that the County hired three new dispatchers on August 22, 2011. Doc. 28 ¶ 19. She noted that "[f]rom [her] observations, they each appeared to be in their 20's." *Id.* According to Plaintiff, she had the capability to perform as a dispatcher, having managed dispatchers and devoted part of job at that time to dispatcher-related duties. Defendants do not directly contest this point, only arguing that, in general, Plaintiff has failed to demonstrate her prima facie case.

42

Plaintiff has the better of the arguments as they relate to the fourth prong of her prima facie case. Her comparable-employee argument does not necessarily prove her point. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("[T]he plaintiff must show that the "comparables" are similarly-situated *in all respects*."). Nor does her situation directly match that from *Ercegovich. See Adams v. Proto Plastics, Inc.*, 151 F. App'x 468, 470 (6th Cir. 2005) ("*Ercegovich* was thus decided in the context of disparate treatment between older and younger persons who were all included in the reduction in force. *Ercegovich* did not involve a situation like this case where the comparison is made between a terminated plaintiff and multiple employees who were not subjected to the reduction in force. *Ercegovich* is simply not analogous."). Still, even if not comparable in all respects, Plaintiff presents evidence indicating that Defendants hired three significantly younger workers to perform a job for which Plaintiff was qualified and had performed in the past. She also presents evidence that Greenlaw sought to eliminate Plaintiff's position regardless of the reason put forth for doing so. *See* doc. 43 at 86 (Ex. G). And she puts forth evidence indicating that she never had the opportunity to move into one of the positions filled by the younger women. This serves as enough circumstantial evidence "to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich*, 154 F.3d at 350. Plaintiff has therefore met her prima facie burden.

Defendants offer a number of explanations for the reduction in force. As one, they point to the November 2010 .62 mill levy that failed; according to Defendants, the Call Center had been counting on the levy in order to continue to operate at full capacity. As another, Defendants argue that the Call Center felt that it was short staffed at the telecommunicator positions, and that the reduction of other positions would free up more money for hiring additional

telecommunicators. Greenlaw offered several additional reasons for the elimination of, among others, Plaintiff's position. He testified that he did not feel that the Call Center was "getting [its] money's worth of the positions" he eventually eliminated. Doc 37 at 87. He also explained in his statement of rationale to the Board of County Commissioners that the improvement in technology for the Call Center meant greater efficiency; and that greater efficiency allowed the Call Center to cut costs and cut positions without taking a hit on the quality of its operations. *See* doc. 43 at 179–80 (Ex. V). Finally, Greenlaw explained that, for cost reasons, he could not achieve his stated goals for the next calendar year without the elimination of the three positions he in fact eventually chose to eliminate. As for the actual goals, one related to accreditation in "EMD, EFD and EDP, [and] CALEA," and another was to "[p]urchase and equip new field communications unit [and] revamp the training facility." Doc. 37 at 93–94.

Plaintiff counters by attempting to demonstrate pretext under either of the first two *Manzer* prongs: (1) by showing that the proffered reasons have no basis in fact; and (2) by showing that the reasons did not actually motivate the decision at issue. *See Braithwaite*, 473 F. App'x at 410. Plaintiff's attempts to do so under the first *Manzer* prong fail. She cannot demonstrate at this stage that any of Defendants' explanations are factually false.

Plaintiff also presents several arguments under the second *Manzer* prong. They closely track the arguments she put forward to meet her burden under as the fourth prong of her prima facie case. The questions as to the fourth prong in a reduction-in-force case and the last part of the burden-shifting analysis are similar. The only difference at this stage is whether Plaintiff has put forth the sort of evidence that demonstrates Defendants' reasons as pretextual. *See St. Mary's Honor Ctr.*, 509 U.S. at 515 (1993) (noting that the essence of the third part of the

burden-shifting analysis is whether "discrimination was the real reason" for the act at issue); *see also Ercegovich*, 154 F.3d at 350 (regarding the fourth prong of a plaintiff's prima facie case— "evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons"). Based on the arguments advanced, a reasonable jury could find that Defendants' proffered reasons for eliminating Plaintiff's position amount to pretext. As discussed, the evidence indicates that Defendants hired three significantly younger women as dispatchers less than two weeks after Plaintiff was eliminated; and that Plaintiff was qualified for but never provided the opportunity to work in one of the newly formed dispatcher positions. The evidence also indicates that Greenlaw sought to eliminate Plaintiff's position as soon as he could, telling Brittany Craig he "would be happy to get rid of [Plaintiff] tomorrow" when Craig raised concerns about doing so. Doc. 43 at 86 (Ex. G). Based on this, the Court cannot say that no reasonable jury could find that Plaintiff was let go for an impermissible reason. Defendants' motion for summary judgment on this claim is thus denied.

## IV. CONCLUSION

For the reasons stated, Plaintiff's objection, doc. 26, is **OVERRULED as moot**. Plaintiff's motion for summary judgment, doc. 22, is **DENIED in part** and **GRANTED in part**. Specifically, Defendants' motion for summary judgment is:

- **DENIED** as to Plaintiff's claim that Greenlaw's conduct and comments created a sexually hostile work environment in violation of Title VII and the Ohio Revised Code;

- **DENIED** as to Plaintiff's claim that Greenlaw's conduct and comments constituted sexual harassment under Ohio common law, *see Kerans v. Porter Paint Co.*, 61 Ohio St. 3d 486, 575 N.E.2d 428 (Ohio 1991);

- **GRANTED** as to Plaintiff's claim that the Call Center's failure to promote her violated the ADEA;

45

- **DENIED** as to Plaintiff's claim that the Call Center's failure to promote her violated the Ohio Revised Code; and

- **DENIED** as to Plaintiff's claim that the elimination of her job constituted age discrimination in violation of the ADEA and the Ohio Revised Code.

   **IT IS SO ORDERED.**


_____1 – 10 – 2014_____                              _____
**DATE**                                            EDMUND A. SARGUS, JR.
                                                    **UNITED STATES DISTRICT JUDGE**